J-A28022-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.E.A., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.B.A., FATHER | : : : : : : : : | |
| | : | No. 934 MDA 2021 |

Appeal from the Decree Entered June 10, 2021
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  26-ADOPT-2020

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED JANUARY 25, 2022**

Appellant T.B.A. (Father) appeals from the order granting the petition of Appellees T.M.L. (Mother), and B.C.L. (Stepfather) (collectively, Petitioners) and involuntarily terminating Father's parental rights to B.E.A. (Child), born in February of 2012.  We affirm.

The orphans' court set forth the following findings of fact:

- [Mother] and [Father] lived together when [Child] was born. [Father] participated in [Child's] care, including providing physical, emotional, and financial support.

- In 2015, the relationship between [Mother] and [Father] ended.

- On March 12, 2015, the court entered a Final Protection from Abuse Order (PFA) against [Father] on behalf of [Mother]. [Father] violated the PFA by communicating with [Mother] via

---

[*] Former Justice specially assigned to the Superior Court.

her cell phone and once serendipitously meeting her at the mall.

- The PFA afforded [Father] visitation with [Child] every other weekend and permitted [Father] to contact [Mother] regarding [Child]. [Father] exercised custody of [Child] under the PFA.

- In February 2016, [Father] was incarcerated for non-payment of child support. He was released in April 2016.

- [Father]'s first priority after his release from incarceration was seeking rehab. In April 2016, [Father] entered an in-patient rehab program. He was discharged in November or December 2016.

- On February 11, 2016, the court entered a Custody Order (2016 Order). The 2016 Order granted [Mother] and [Father] shared legal custody. The 2016 Order also granted [Mother] primary physical custody.

- The 2016 Order granted [Father] partial physical custody on alternating weekends subject to three preconditions; [Father] was required to: 1) pass a hair follicle drug test; 2) maintain a stable residence for at least four months; and 3) possess a reliable and working cell phone. [The 2016 Order also provided that Father had the right to supervised partial physical custody through the Salvation Army, ABC House, or another mutually agreed-upon supervised visitation program.]

- [Father] never fulfilled the preconditions under the 2016 Order so he could exercise partial physical custody. Thus, [Father] never exercised physical custody of [Child] under the 2016 Order.

- Although [Father] reads and understands the English language, he claims he did not understand the 2016 Order, including how to arrange a drug test. However, [Child's] paternal grandmother spoke to [Father] about the preconditions. Further, [Father] read the 2016 Order aloud from the witness stand without issue.

- [Father] testified he believed the PFA prohibited him from contacting [Mother] and exercising custody under the 2016 Order. However, the PFA contained a provision permitting [Father] to contact [Mother] regarding [Child].

- [Father] moved in with his fiancé[e] . . . in March 2017. [Father] has lived at his current address since June 2017.

- [Mother] last saw [Father] in-person in 2017. During a meeting at the Domestic Relations office, [Father] asked [Mother] how he could see [Child]. [Mother] referred [Father] to the 2016 Order and her attorney.

- In 2018, [Father] was incarcerated on a DUI charge for 72 hours.

- In mid to late 2018, [Father] learned [Mother] and [Child's] address through [Child's] paternal extended family.

- [Father's] last physical contact with [Child] occurred on June 22, 2018. [Father] stopped by [Child's] paternal grandparent[s'] house without knowing [Child] was there. [Father] and [Child] spent about two hours together.

- [Father] had not fulfilled the preconditions of the 2016 Order prior to his contact with [Child] on June 22, 2018.

- [Mother] and Stepfather married on September 15, 2018. [Child] has known Stepfather since 2015 and lived with Stepfather since 2018. Stepfather and [Child] have formed a parent/child bond. They enjoy time together hunting, target shooting, working around the house[,] and playing video games. Stepfather provides for [Child's] financial, physical, and emotional needs.

- [Child] refers to Stepfather [by his first name] except when [Child] is in an upset emotional state; during those times [Child] refers to Stepfather as "Father" or "Dad."

- [Child] has expressed his desire to be adopted by Stepfather.

- Stepfather is willing to accept legal and physical custody of [Child] and intends to adopt him.

- [Father] reached out to legal aid organizations three or four times from June 2019 to November 2020 regarding custody of [Child] but did not qualify for services. [Father] testified he also reached out to private attorneys but could not afford them.

- [Father] did no research or investigation into representing himself in the custody court.

- [Father] testified he reached out to Alternative Behavior Consultants (ABC), a supervised parental visitation program, for intake in August 2019 and again at the beginning of 2020. However, ABC only received one request for visitation from [Father] in January 2020.

- In August 2019, [Father] messaged Stepfather twice via Facebook regarding ABC. [Mother] filed paperwork at ABC in 2019.

- In February 2020, [Father] messaged Stepfather via Facebook requesting [Mother] submit additional paperwork to ABC, but [Mother] was not required to file additional paperwork by ABC.

- [Father's] intake at ABC was delayed to July 2020 because of [Mother's] limited availability and COVID-19 restrictions. [Father] never exercised physical custody of [Child] at ABC.

- In February 2020, [Child] told Stepfather he wanted Stepfather to adopt him. Stepfather intends to adopt [Child].

- In June 2020, [Father] messaged Stepfather via Facebook stating [Child] is [Father's] son, not Stepfather's son.

- As of May 2021, [Father] was $547.92 in arrears on child support for [Child]. [Father] is currently unemployed and was last employed in January 2021.

- [Mother's] cell phone number, which [Father] has used to contact her in the past, has not changed since 2015. [Mother] and [Child] have lived at the same address since 2018.

- [Father] messaged Stepfather via Facebook from 2015 to 2020. [Father] never inquired after [Child] in these messages.

- When [Father] requested information from [Mother] in Facebook messages to Stepfather, [Mother] responded by texting her answers to [Child's] paternal aunts. [Mother] does not have a working cell phone number for [Father].

- [Mother] is in contact with several members of [Child's] extended paternal family, including paternal grandparents, two paternal aunts, and a paternal uncle. [Father] inquires about [Child] to [Child's] paternal aunts and uncle. [Child] is not aware of [Father's] inquires through [Child's] paternal aunts and uncle.

- [Father] has never attempted to contact [Mother] or [Child] through [Child's] extended paternal family.

- [Child] spends every other weekend with his paternal grandparents and takes occasional week-long vacations with them. [Mother] intends to maintain [Child's] relationship with his paternal grandparents.

- [Father] is not involved in [Child's] education or medical care, nor has he sent notes, cards, or presents to [Child]. [Father] posts a birthday message on Facebook every year on [Child's] birthday, but no evidence was presented [Child] is aware of these messages.

- [Petitioners filed a petition for involuntary termination of Father's parental rights on July 13, 2020.] The legal grounds asserted for the termination of the parental rights of [Father] are: 23 Pa.C.S. § 2511(a)(1) – "The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."

Orphans' Ct. Decree, 6/10/21, at 2-6 (footnotes omitted and formatting altered).

The orphans' court held a hearing on the petition to involuntarily terminate Father's parental rights on May 4, 2021.[1] Mother, Stepfather, and Father all testified at the hearing. The parties also stipulated as to what Child's paternal grandmother and paternal uncle would testify to if they had been called as witnesses.

_____

[1] The orphans' court appointed Lauren Sulcove, Esq. as Child's legal counsel pursuant to Section 2313(a) on September 3, 2020. **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1223-24 (Pa. 2020) (stating "[a]s we have previously recognized, [23 Pa.C.S. §] 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome, and the failure to appoint counsel constitutes structural error in the termination proceedings" (citation and quotation marks omitted)).

- 5 -

On June 10, 2021, the orphans' court issued a decree involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(1) and (b). *Id.* at 11-12.

On July 9, 2021, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion adopting the reasons set forth in its June 10, 2021 decree. *See* Orphans' Ct. Op., 7/15/21, at 3-4.

On appeal, Father raises a single issue for our review: "Whether the [orphans'] court's decision to terminate [Father's] parental rights was supported by clear and convincing evidence and did not constitute an abuse of discretion." Father's Brief at 5.

Our Supreme Court has explained:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are

- 6 -

observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, [23 Pa.C.S. § 2511,] which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid.

*In re M.T.*, 101 A.3d 1163, 1178-79 (Pa. Super. 2014) (*en banc*) (citations omitted and formatting altered).

We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.L.G.***, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation and quotation marks omitted).

### Section 2511(a)(1)

Father argues that the orphans' court erred in concluding that there was clear and convincing evidence that Father had shown a settled purpose of relinquishing his parental rights and/or he failed to perform parental duties for at least six months prior to the filing of the instant petition. Father's Brief at 14. Father acknowledges that he was absent from Child's life but contends that he credibly testified that he was absent because he was focusing on his sobriety so that "he could be well for his son." ***Id.*** at 14-15. Father also argues that the orphans' court did not consider the efforts he made to perform parental duties in the six months preceding the filing of the petition to terminate his parental rights or the obstacles he faced in doing so. ***Id.*** at 15-16. Specifically, Father asserts that he reached out to Stepfather to restore contact with Child and that Mother testified that she never responded to Father's attempts at contact. ***Id.*** at 15. Father notes that he worked with ABC to initiate supervised custodial time with Child, but there were delays in setting up supervised visitation resulting from a scheduling conflict and the COVID-19 pandemic. ***Id.*** at 15-18. Additionally, Father contends that Mother was uncooperative with Father's attempts to initiate supervised custody by not communicating with Father and then by filing the instant petition. ***Id.*** at 17-18. Finally, Father claims that the orphans' court did not give proper

weight to the circumstances beyond Father's control, *i.e.*, the COVID-19 pandemic and Mother's unavailability and uncooperativeness, which prevented him from exercising custody of Child through ABC. *Id.* at 18.

Section 2511(a)(1) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (emphasis in original). "Although it is the six months immediately preceding the filing of the petition that is most critical in the analysis, the trial court must consider the whole history of [the] case and not mechanically apply the six-month statutory provision." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

This Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs,

- 9 -

physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations and quotation marks omitted). In *B., N.M.*, the Court rejected the father's claims that his ignorance of the law and lack of information about the mother's new telephone number prevented him performing his parental duties. *Id.* at 856-57. The *B., N.M.* Court held that although the "[f]ather was not required to perform the impossible, he was obligated to act affirmatively to maintain his relationship with [the child], even in difficult circumstances" and that the "[f]ather failed to act to the best of his ability to meet his obligation despite his incarceration and the obstacles [the m]other placed before him." *Id.* at 857 (citation omitted).

Our Supreme Court has held that

- 10 -

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998) (citation omitted); *accord In re J.T.M.*, 193 A.3d 403, 409-11 (Pa. Super. 2018) (affirming the termination of the incarcerated father's parental rights when the father only sent the child a single letter and had paternal aunt engage in limited contact with the child on his behalf).

This Court has noted that

we may not consider any effort by the parent to remedy the conditions described in subsection (a)(1) . . . if that remedy was initiated after the parent was given notice that the termination petition had been filed. Further, this evidentiary limitation applies to the entire termination analysis. The court, however, may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date.

*Z.P.*, 994 A.2d at 1121.

Additionally,

to be legally significant, the post-abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*Id.* at 1119 (citation omitted and formatting altered).

- 11 -

Here, in addressing Section 2511(a)(1), the orphans' court explained:

The facts that support . . . termination [of Father's parental rights] are as follows:

  a.  [Father's] last physical contact with [Child] was June 22, 2018. Prior to this, [Father's] last physical contact with [Child] was in 2015.

  b.  [Father] has not been involved in [Child's] education or medical care, nor has he sent notes, cards, or presents to [Child]. [Father] supports [Child] financially only by virtue of a court order compelling child support.

  c.  [Father] never vindicated his parental and custodial rights through the 2016 Order or filed for modification of that order.

*　　*　　*

[Father] has not played any significant role in [Child's] life since 2015. [Father's] last physical contact with [Child] occurred on June 22, 2018, when [Father] stopped by [Child's] paternal grandparent[s'] house. [Father] and [Child] spent about two hours together. Notably, this contact was mere happenstance, not the result of [Father]'s initiative; [Father] did not know [Child] would be present at [Child's] paternal grandparent[s'] house. Further, this contact violated the 2016 Order, as [Father] had not completed any of the preconditions under the 2016 Order. [Father] has not sent notes, cards, or presents to [Child] since 2015 or otherwise attempted to communicate with him. [Father] posts a message on Facebook every year on [Child's] birthday and inquires after [Child] through [Child's] paternal extended family, but there is no evidence [Child] has awareness of this.

[Father] made few efforts to communicate with [Mother] about custody. [Father] testified he believed the PFA prohibited him from reaching out to [Mother]; however, the PFA explicitly permitted [Father] to contact [Mother] regarding [Child]. [Mother's] cell phone number, which [Father] had used to contact [Mother] in the past, has not changed. [Father] learned [Mother] and [Child's] current address in 2018, but [Father] never sent communication to their address. Additionally, both [Father] and [Mother] are in contact with [Child's] extended paternal family,

- 12 -

but [Father] never attempted to contact [Mother] or [Child] through them. [Father] messaged Stepfather via Facebook on multiple occasions from 2015 to 2020 but never inquired about [Child's] well-being or asked to relay messages to [Child].

[Father] testified to three reasons for his lack of contact with [Child]: 1) [Father] did not understand the 2016 Order; 2) [Father] did not have an attorney; and 3) [Father's] struggles with addiction. We do not find any of these explanations persuasive.

First, [Father] testified he did not understand the terms of the 2016 Order. However, [Child's] paternal grandmother spoke to [Father] about the 2016 Order, including the preconditions for [Father] to exercise[] partial physical custody of [Child]. Further, [Father] previously exercised custody under the PFA, and [Father] read the 2016 Order from the witness stand during the hearing without issue.

Second, [Father] testified he did not exercise custody because he did not have an attorney. Crucially, [Father] never invoked the custody court to vindicate his rights after the 2016 Order went into effect. [Father] made some efforts to acquire counsel through legal aid organizations and private attorneys, but [Father] never researched or attempted to represent himself in the over five years since the 2016 Order has been in effect.

Third, [Father] testified about his struggles with addiction, including his time in rehab in 2016 and his relapse in 2018 (when he was incarcerated for DUI). His efforts in rehab are laudable. However, [Father's] substance abuse issues do not justify his almost complete absence from [Child's] life.

During the hearing, [Father] repeatedly expressed that he believes there is room for himself, [Mother], and Stepfather in [Child's] life. However, [Father] has done nothing in the past five years demonstrating this is true. [Child] is not required to wait for [Father] to assert a place in his life.

The [c]ourt finds by clear and convincing evidence that [Father], by conduct continuing for a period of at least six months immediately preceding the filing of the petition, refused or failed to perform parental duties. *See* 23 Pa.C.S. § 2511(a)(1).

Orphans' Ct. Decree at 6, 9-10.

Following our review, we find no abuse of discretion or error of law in the orphans' court's conclusion that there was clear and convincing evidence to support termination of Father's parental rights under Section 2511(a)(1). **See S.P.**, 47 A.3d at 826-27; **see also M.T.**, 101 A.3d at 1178-79.

Instantly, the orphans' court noted that Father has been absent from Child's life since Father separated from Mother in 2015. Although the orphans' court considered Father's explanations for his absence, **see Charles E.D.M., II**, 708 A.2d at 91, the court did not find those assertions credible. Specifically, the orphans' court rejected Father's claim that he did not understand the 2016 custody order. **See** Orphans' Ct. Decree at 10. The orphans' court also found that Father "never invoked the custody court to vindicate his rights after the 2016 Order went into effect" and made no attempt to represent himself in the custody action. **See id.** Finally, the orphans' court acknowledged Father's struggle with sobriety, but concluded that it did not justify Father's "almost complete absence" from Child's life. **See id.**

With respect to Father's post-abandonment contact with Child, the orphans' court noted that Father had no contact with Child after 2015, except for an unplanned visit at paternal grandparents' home on June 22, 2018.[2] Although the record indicates that Father made some attempts to exercise supervised custody of Child at ABC, the orphans' court explained that he

---

[2] Father visited paternal grandparents' home that day without knowing that Child would be there. **See** Orphans' Ct. Decree at 3.

"made few efforts" to communicate with Mother about custody arrangements and made no attempt to communicate with Child. *See id.* at 9.

The record supports the orphans' court's findings. *See S.P.*, 47 A.3d at 826-27. Further, we decline to reweigh the evidence or interfere with the court's credibility determinations in that these conclusions are based on clear and convincing evidence established in the record. *Id.* Therefore, we discern no abuse of discretion or legal error by the orphans' court in concluding that Father failed to perform his parental duties pursuant to 23 Pa.C.S. § 2511(a)(1). *See Charles E.D.M., II*, 708 A.2d at 91; *J.T.M.*, 193 A.3d at 409-11; *see also B., N.M.*, 856 A.2d at 855.

## Section 2511(b)

Father contends that Petitioners failed to prove the grounds alleged for termination of his parental rights under Section 2511(a)(1), such that the orphans' court should not have considered whether the termination served the interests of the Child under Section 2511(b). Father's Brief at 18.

Father further claims that the orphans' court

> failed to consider all possible options to maintain strong familial ties and relationships for [Child]. . . . Child spent . . . his formative years, years when significative familial bonds are formed, in the care of both Mother and Father. The evidence shows that [Child] was happy and excited when he last saw Father, and was distressed when Father had to leave. [Child's] emotional needs and welfare are best served by maintaining all familial bonds and ties and allowing him to continue to enjoy the relationships with Mother, Father, and Stepfather.

*Id.* at 19.

- 15 -

Initially, we note that Father did not preserve his appellate challenge to the orphans' court's ruling under Section 2511(b) in his Rule 1925(b) statement. Additionally, Father failed to cite any relevant legal authority to support his Section 2511(b) claim. ***See*** Father's Brief at 19. While we could conclude that Father has waived this issue, ***see*** Pa.R.A.P. 1925(b)(4)(vii), 2119(a); ***In re M.Z.T.M.W.***, 163 A.3d 462, 466 & n.3 (Pa. Super. 2017), we will consider the orphans' court's ruling under Section 2511(b) in the interest of justice. ***See C.L.G.***, 956 A.2d at 1009 (addressing the trial court's analysis of Section 2511(b) despite the mother's failure to present a challenge under that subsection).

Once the statutory grounds for termination have been met under Section 2511(a), the court must consider whether termination serves the needs and welfare of Child, pursuant to Section 2511(b). ***See M.T.***, 101 A.3d at 1178-79.

Section 2511(b) provides:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." **C.L.G.**, 956 A.2d at 1008 (citation omitted).

The **C.L.G.** Court further explained that regarding Section 2511(b):

Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

Moreover, [t]he court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

**Id.** at 1010 (citations omitted and formatting altered).

"[W]hen evaluating a parental bond, the court is not required to use expert testimony. . . . Additionally, Section 2511(b) does not require a formal bonding evaluation." **In re D.L.B.**, 166 A.3d 322, 328 (Pa. Super. 2017) (citation and quotation marks omitted). Further, this Court has explained that "the existence of some bond" between a parent and a child "does not necessarily defeat termination of . . . parental rights." **In re K.Z.S.**, 946 A.2d 753, 764 (Pa. Super. 2008). Rather, the question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. **Id.**

Here, the orphans' court addressed Child's best interests as follows:

No evidence was presented that whatever limited bond existed between [Father] and [Child] on June 22, 2018, still exists. [Child] does not look to [Father] for emotional or physical support; [Father's] only support toward [Child] has been financial and only then as compelled by the [c]ourt. It is clear [Mother] and Stepfather, not [Father], provide [Child] the love, comfort, security, and stability he needs. [Child] looks to [Mother] and Stepfather as his parental figures, not [Father]. Indeed, [Child] himself expressly desires to cement his parent/child bond with Stepfather through adoption.

Severing [Child's] bond with [Father], to the extent it even exists, will allow [Child] to move forward in life with little to no long-term ill effects. It is in the [C]hild's best interests that the parental rights of [Father] be terminated.

Orphans' Ct. Decree at 10-11.

Based on our review of the record, we discern no basis to disturb the orphans' court's finding that termination of Father's parental rights would best serve Child's needs and welfare. *See K.Z.S.*, 946 A.2d at 764. After hearing testimony from Father, Mother, and Stepfather during the termination hearing, the orphans' court concluded that there is no significant bond between Father and Child. *See* N.T. Termination Hr'g, 5/4/21, at 21, 29 (Mother testified that Child does not recognize Father in photographs or ask about Father), 43 (Stepfather testified that Child does not look at Father as his father anymore), 88-89 (the parties stipulated that paternal grandmother would testify she does not believe Child has a relationship with Father because of lack of contact over an extended period). Further, the court found that Stepfather and Mother have consistently provided Child with the "love, comfort, security, and stability" that Child needs. *See id.* at 23-24, 39-41 (Stepfather performs recreational activities with Child, Stepfather provides

- 18 -

emotional support for Child, when Child is emotional, he addresses Stepfather as "Dad", Mother and Stepfather provide for Child's emotional, psychological, and financial needs, and Child asked Stepfather to adopt him), 88-89 (the parties stipulated that paternal grandmother would testify about the bond between Stepfather and Child). Upon review, the record supports the orphans' court's findings of fact, including its credibility determinations. *See S.P.*, 47 A.3d at 826-27.

Under these circumstances, we conclude that the orphans' court appropriately considered the developmental, physical, and emotional needs and the welfare of Child and determined that they were best served by the termination of Father's parental rights. *See C.L.G.*, 956 A.2d at 1010. The record evidence supports the orphans' court's finding that there was little to no bond between Father and Child, that Stepfather has a parental bond with Child, and that severing the bond between Father and Child to allow Stepfather to adopt Child is in Child's best interest. *See K.Z.S.*, 946 A.2d at 764. For these reasons, we conclude that the orphans' court did not abuse its discretion, and that its determinations and findings were supported by clear and convincing evidence, free of legal error. Accordingly, we affirm the decree involuntarily terminating Father's parental rights. *See S.P.*, 47 A.3d at 826-27.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2022